May it please the court, Madam Clerk, Council. We are here today because of a change in the IDEA in 2004, and it presents a novel issue in regards to the impact of parental consent on the application of the IDEA. To this Council's knowledge, this issue has not been brought before court in this country as far as what is that impact of the change in IDEA in 2004 on consent to the impact on parental rights and on whether IDEA applies including its administrative procedures. The application of these changes is something that the plaintiffs contend is necessary to give effect and meaning to all the aspects of the IDEA. So we step back and look at there's been an evolution, if you will, in the law regarding the treatment of children with disabilities in the educational setting. It started back when prior to say the 1970s, students with disabilities were segregated, institutionalized, not even afforded educational opportunities. To where we are today now is that there's mainstreaming, inclusion, there's more treating of children or people with disabilities as mainstream in society. In the educational context, Congress has acted on multiple occasions to follow that evolution. And so in 2004, IDEA, which came into effect back in approximately 1984, was amended. And one of the key amendments dealt with the consent issue. Prior to 2004, parents always had an obligation or right, I should say, to consent to an evaluation, to placement, and to services under IDEA. Conversely, the school district prior to 2004 had the right and arguably the duty to be able to contest, to override this consent in the evaluation stage, placement stage, and at the provision of services stage to override that consent and provide services under the act. What happened in 2004 is while the consent, the ability of the district, the option to override the consent at the evaluation stage remained, it was removed. It was prohibited any longer for the district to challenge the refusal to consent at the provision of services stage. What's your view of the effect of the Supreme Court's Frye decision? Your Honor, I think where this is is this is almost a step before, if you will, Frye, or an additional element that the Frye court did not specifically consider is the impact of the consent issue on administrative remedies. Where that plays in is we believe our position is consistent with Frye in this sense that what's being looked at here is access versus content. And the Frye court looked at that and looked at where there's specifically discrimination disability under section 504 in ADA. The court in its cases seemed to place emphasis on trying to determine whether a free appropriate public education is at issue, which tends to steer things toward the IDEA's requirement for exhaustion. And we appreciate that and agree with that, that the courts are looking to see that, but the court in Frye did look and see where there's specific things, such as a wheelchair-bound student seeking a ramp to be able to access the school setting. That still relates to education, but it's strictly related to accommodating the disability. Now the added piece to that is with this consent is you have, in this case, the plaintiffs, the parents of ED who have consistently refused the provision of services under IDEA. In essence, they never opted in. They never sought provision of change content or those educational or related services under IDEA. And so the consent piece is what we're arguing is that it relates to the gravamen, if you will, of the complaint from the standpoint that the plaintiffs are not seeking any type of remedy protection right under IDEA. And the IDEA, as it was changed in 2004, affords them that right and that power to refuse that to provide consent under those services. You're right on the merits, but how is that consistent with 1415L? That seems to contemplate that, yes, you can refuse to consent, but you still have to exhaust. And I think, Your Honor, you have to exhaust if you're seeking protections under IDEA, if you're seeking educational content services, specialized instruction, specialized content, individualized education. That's not what the plaintiffs have here. But that's not what the statute says. The statute, again, I'm in 1415L, it says, except that before the filing of a civil action under such laws, seeking relief that is also available under this subchapter, seeking relief that is also available under the IDEA. And so I guess my question for you is, is the relief you're seeking also available under the IDEA? Yes, I think it could be. I think some of the accommodations, where the distinction here is in tying in the consent piece, Your Honor, is taking the example from Frye of the wheelchair-bound student who's seeking a ramp. Say the school district, in addition, said, we think that part of this, the accommodations are, give a wheelchair ramp, but you should also have some math remedial services, you should have some reading remedial services. And the parents said, no, excuse me, we refuse to consent to that. We don't want that. And so the school said, well, then not only do you not get the services, you don't get the ramp either. Parents then come to this court or a court and assert their Section 504 ADA rights. Would the court find, oh, well, you had to exhaust your remedies under IDEA simply because there was an accommodation that conceivably could have been offered under IDEA? I think the answer is yes, though, because that's what the statute says. If the relief is also available under the IDEA, the procedures under subsections F and G shall be exhausted to the same extent as would be required if the action were brought under this subchapter. And where we're saying is that that section, 1415L, which came into play back in 1984 with the IDEA, has not been interpreted or updated in light of the new consent language. But we're still stuck with it, right? We're still stuck with it. And whether you consent or not, like I said, I think you're right under the first clause. I think the second clause is where your difficulty comes in. Fair enough, Your Honor. And where I appreciate is that that's why we say this is a novel issue, because the implication or the impact of the consent and the absolute authority to refuse consent to services, which then you'd say, OK, they don't want IDEA services. So now they're still forced to pursue administrative procedures under the IDEA for solely section 504 and ADA rights. Well, that's inconsistent with section 504 in the ADA, because they don't have any administrative procedures. They give you a right to a private cause of action, which you could seek any number of types of relief, some of which are not available under the IDEA. Well, you're saying they're asking only for 504 rights. Correct. But you look at your complaint and in your complaint, you say everybody, everybody acknowledges that the child is disabled. What you want is a meeting with the parents and specialists and the school. You ask for 18 accommodations, including some assistive devices. And after you agree upon those accommodations, you're going to probably write it up into some type of written document so the teachers and counselors and everybody knows what those accommodations are. That sounds like an individual education plan. How is that any different than an IEP? How that's different is, Your Honor, is we respectfully believe that those accommodations relate to access related to the disability. They're accommodations related. That's what you do in an IEP. You have a child who has a disability. And in this case, you need hearing assistance. You need an iPad. You need special software. That's what you do in an IEP and that schools do every day in an IEP. You can do it at an IEP. You're right, Your Honor, but you don't have to. Isn't that what the Supreme Court said in Frye? Well, we're not going to ignore the administrative remedies just because you call it something else. If it's an IEP, it's an IEP. Two points, Your Honor. First of all, this isn't a situation where they were engaged, they had somehow accepted or given consent to an IEP and then revoked it, recast it, which is what a lot of these cases that have come upon this issue are. So in here, they were always just seeking the access, not specialized content, because even the accommodations that Your Honor has identified, which we support, are aids to deal with the disability so that ED can participate in the same educational environment as other non-disabled students. That is a disability discrimination. The second point I would add is, on the consent piece, that's what the Frye Court did not address is, what's the impact of that consent? And how do we give meaning? T to this clear mandate of law that says a parent can refuse to consent. And if they can refuse to consent, then are they still into the IDEA? Take that further, these parents refuse to consent to the services, which the district may very well believe they need an IEP, this student needs an IEP, ED needed this. But they can't challenge it. Well, now they go into the administrative procedures, and what's happened? The district is now able to, in essence, challenge to override that consent. And a hearing officer may rule on that. They can always withdraw their consent at any time. They don't have to go through the administrative procedure if they want to remove the child, which is what they did. That's correct. But what we're saying, what argument is here is, we never entered the process. We never entered an IDEA. It was clear throughout that they did not want those services. Now, parents have, in this case, parents may very well have many reasons. I mean, that's one of the evolutions in the law, is that as children and people with disabilities are mainstreamed more into society, are looked to build independence, that's what parents such as the parents of ED have an interest to. They have a lifelong interest in socialization, social emotional development, in a relationship with all types of people, may be equally if not more important to a parent, particularly at a younger age, such as ED in a kindergarten, first grade level. Note in kindergarten, he didn't even have an IEP. And he still does not have an IEP and has continued on in a general education. Counsel, I want to challenge you. I mean, it is perilous to try to figure out what Congress was thinking in passing these laws. I'm just going to posit what I think they may have been thinking, even though I think purpose is hard here. 1415L, I think it's getting at what Judge Malloy is getting at, which is, these statutes overlap. The relief you can get under these statutes overlap for disabled kids. And I think what they're saying is, because they overlap, something that, you know, may be a bill like an IEP that the parents haven't even contemplated may be more, may be fit better than relief that they could get under the Rehabilitation Act or the ADA. So what we're going to do is we're going to streamline the process under this exhaustion requirement. And we're going to say, there's one process, even though there's three sets of rights, the rights under the ADA, the rights under the Rehabilitation Act, and the rights under the IDEA. But we're going to streamline it so you have to go through the IDEA process. Am I wrong about that? That seems to me to be a very logical plan. It's not necessarily the plan I would come up with or the scheme I would come up with, but it makes a lot of sense to me. You know, I would agree that it's logic, and I'd also agree it's difficult to divine what Congress is thinking in writing statutes. But I think the changes in the statutes don't always, always mesh either. You even look at the regulations for Section 504, and they still use the word handicap. They haven't even updated the language on that. So while there is interlap of these statutes, there is also separate and distinct rights that you can afford under Section 504, under the ADA, and separate and distinct rights such as a right to a private cause of action, which in theory, the administrative process could be more streamlined, but it may not be, because the prospect of a lawsuit or some other damages may streamline the process under Section 504 or under the ADA. And that's where the consent piece is now saying, if that's the case, then the fact that they can refuse to consent and never opt in and only seek discrimination accommodations under Section 504, it's meaningless. No, they can refuse to consent, but they just have to, in trying to get their ADA and Rehabilitation Act rights, they just have to go through the IDEA process. So you can refuse to consent, but you've got to appeal just the same way that the IDEA wants you to do that. So it wouldn't render the consent meaningless. It just means you have to follow that streamlined procedure. And respectfully, we would say that conflicts with what this consent provision provides, because consent says you can refuse IDEA, and Section 504 says you have the right to pursue a private right of action, and under ADA, you have a right. And that's what we believe is the impact of this change in the statute and why it certainly allows. So I'd like to reserve, I don't have a lot of time left, but I'd like to reserve the remainder. Thank you, Your Honors. Thank you, Mr. Pinn. Ms. Schmanke? Good morning. May it please the Court. I'm Sarah Schmanke for Defendant Pallmeyer, R1 School District. I think as the Court has correctly just indicated, the exhaustion provision of 1415 and the Supreme Community Schools directly impacts this case. Contrary to appellant's argument, they were required to exhaust their administrative remedies in this case. The plaintiffs... What's the... I'm having trouble, a little trouble wrestling with, what's the practical difference here? The school district says we want to do an IEP, the parents say we want to do a 504 plan. They look very similar in a lot of respects. As I mentioned, I think there's 18 accommodations they wanted. Why does it make a difference if it's a 504 or an IEP? I think these issues are difficult to parse out because there is overlap in the statutes. Both statutes and regulations speak to a FAPE requirement and designed individualized instruction. So it is necessary under either 504 or IDEA to provide FAPE. I believe that that is why, recognizing that there's overlap, Congress specifically drafted section 1415 to say, we recognize this isn't the only law that protects children with disabilities in a school setting, but before you bring a claim under any of these other laws, challenging the education of a student with a disability against a public school district, you must administer or go through that administrative process. You must exhaust that process so that an agency can apply its expertise to the decisions. What's the rationale for that? What's the justification for creating what amounts to a hoop for parents to navigate when their principal concern is their child's welfare and not whether certain boxes are checked in administrative law? I think the Supreme Court, as well as this court, has recognized that the rationale for that provision is that it allows an administrative agency to apply its expertise, to develop a full record that is appropriate for judicial review, to potentially come up with some resolution and allow the agency to correct an error, and then also to expedite the process. I think we would agree in education that a child's education and time in school is critical. Most educators would argue that 174 days, which is generally what you have in a school year, is not enough time. So to spend three years litigating what educational accommodations a child should have, as we have in this case, is to the harm of the student. How long would it take to work through the IDEA process? It's a much shorter timeline. And typically... How much shorter? I would say approximately three months, Your Honor. Hearings are usually held within three months. There can be a provision for even an expedited hearing. But before you even get to the hearing, there is an option to sit down the parties together, try and resolve it, or to go through a mediation. So again, it's designed to really expedite that process to bring resolution to the issues and develop a full record which the agency has applied its expertise. Looking at the Supreme Court's recent precedent in Frye, the court recognized that there are those other statutes which protect the rights of kids, but said the central issue, the issue that a court must decide, is whether or not the claims before it seek relief for denial of faith. In this particular case, they do. The court instructed us in Frye to look at the gravamen, or the substance, of the claims before it. Looking at the claims brought in this case, among other things, they challenge the district's IDEA evaluation of ED, saying that it was not based upon correct information, and that it misidentified or classified ED's disability. And as a result, they had to reject IDEA services for ED. It challenged the content of the IEP, saying that it was incorrect. It lists, as you recognized, a litany of educational accommodations, some of which are related age, such as text-to-speech for reading, or speech-to-text for writing. And as you can imagine, when the focus in kindergarten and first grade is to teach children to read and write, that's a fundamental alteration of assignments, objectives, and goals that require specialized instruction. And so those are all things that need to be parsed out through the administrative process and determined with the expertise of an agency, what is the appropriate educational instruction accommodations. Counsel, on the opt-out point that opposing counsel makes, that's really his strongest argument. His point is, when a parent, they have the unconditional right to withdraw from the IDEA, and so it's unfair, it's crazy, why would I have to go through a process that I said I don't even want to go through this process? And so what's your argument against that? I would agree that the IDEA and the regulations do give parents the right to opt out of IDEA services. They have the right to refuse, and school districts may not challenge the refusal of services. But I would also submit that that's not an issue in this case, because it is undisputed that after the parents refused services under IDEA, the district did not implement the IEP that had been developed for ED. They didn't try and force those services on ED. They continued to offer the same accommodations that the parents requested, including as IEP, but we never required the parents to confirm their opting out of IDEA services with an administrative hearing. Rather, I think the issue is whether or not they could have gotten relief, and in this case, they could. If you look at their complaint, which I just detailed, it most definitely speaks to issues that could have been resolved in an administrative process. The evaluation and identification of a student with a disability, whether or not the content of an IEP was appropriate, and the appropriate educational accommodations for a student. And so I think that's the reason why they need to go through the administrative process, and why the administrative process could have afforded them appropriate relief. In addition, the specific relief that they seek, including educational accommodations, educational modifications, compensatory services, and attorney's fees, were all available in that administrative process had they gone through the process. Plaintiffs would have this court write into the IDEA an additional exception that provides that if parents choose not to consent to IDEA services, then they're not required to exhaust. They want to try and draw a link between section 1414, consent position, and section 1415, the exhaustion provision, that isn't currently there. Congress could have drafted that and chose not. Their argument is more basic than that, which is if I opt out of the IDEA, I opt out of the whole IDEA, and that includes the requirement to follow its procedures. I think that's the argument they're making. And I would say that the statute does not give them that right. The plain language of the statute says if you're seeking relief that's also available under the IDEA, then you need to exhaust your administrative remedies. I think they're having, would have this court write into the IDEA exception that is not there and has not been recognized by any other court that plaintiffs have pointed out. What do you do with the, suppose, how do you handle a situation where the parents say, we do want to opt out, which everybody agrees they have a right to do that, and the school district strongly feels that this, the child needs services. How do you handle that situation? I think those are extremely difficult situations. I think school districts that I've worked with would continue to try and work with that family, communicate with that family, express to them, you know, the reasons why they think that an IEP and additional services and support would be appropriate and help their child in the absence of consent from a family, then you can't implement an IEP, but you could continue to provide support, instructional support to a child. You know, we differentiate instruction for every child. So I think we would continue to try to do our best to implement good educational practices as well as work with and communicate with the family. Just to briefly summarize, I think based on the gravamen and the substiments, the substance of the plaintiff's complaint in this case, the district's court finding that they required to exhaust their administrative remedies was correct. In addition to the complaint itself, the court also has before it in the record additional pleadings which lend to that fighting, particularly the opposition to the district's motion to strike or limit expert testimony. The plaintiff's opposed limiting their expert testimony on their alleged issues with the IDEA evaluation and misclassification of ED as well as the IEP content. If plaintiff's claims did not seek redress for a violation of FAPE, that testimony would be irrelevant. So I believe that opposing, striking or limiting that testimony is telling on the gravamen of their complaint. Additionally, prior to questions that the court instructed us to look at specifically whether the claims could be brought by an adult or whether the claims could be brought by or against another facility also lend to a finding that this is about FAPE. These claims could only be brought by a child in the educational setting as the court correctly found. I'd like to ask you one quick question about the record. In the complaint and in the argument today, opposing counsel has indicated there has never been an IEP created for ED. But I understand from your briefing that you say there was an IEP. What does, where in the record or what does the state of the record show about whether there was an IEP process ever even started and an IEP plan ever created? Sure. The draft IEP that was created by a multidisciplinary team that included the parents of ED during his kindergarten year is included in the record at APP 127 through 137. And just to clarify the factual issues in this case, while parents have said that they did not participate in the process, they most certainly did. They indicated to the school district and brought ED's disability to the school district initially before he even came into kindergarten saying, hey, we think we have a child who qualifies as a student with a disability under both IDEA and 504. So the school district started that process as it's required to do under the statutes. The parents expressly consented to an IDEA evaluation. They provided their own private medical records, including records from the Mayo Clinic. In that process, they ultimately, prior to kindergarten, refused consent to services after the district and the team found that, in fact, he was a student with a disability. Then we went through the process again after ED struggled in kindergarten and wasn't making sufficient academic support. He was again referred by a teacher this time, his kindergarten teacher. The parents, again, participated in that process to determine whether or not ED was a student with a disability under IDEA and what accommodations and services he may need. Again, providing medical records and their own private information. They participated in each of the meetings. And, in fact, they even wrote on, you know, marked out certain accommodations, modifications, and added other to the draft IP that is in the record. If the court doesn't have any other questions for me, I would just quickly note that, in addition to the exhaustion of administrative remedies, which is required in this case, there's ample record before the court to find independent reasons for finding judgment in the court as briefed in our brief, particularly that their 1983 claim is precluded by the remedial scheme of Section 504 and ADA, as well as their inability as a matter of law to reach the prima facie elements of their claims, particularly bad faith, gross misjudgment, and the elements of their retaliation. One question about what you just said. The Section 1983 point, their substantive due process claim seems to be that you're interfering with their parental rights. And that seems to me to be something that is not available to be litigated under the IDEA. And I'm going to ask opposing counsel about this as well. But is that, how do you exhaust that? That's a constitutional claim that you're interfering with my parental rights. Now, maybe I'm wrong about that. Maybe that's not their claim. And you can tell me it's not. But how do you exhaust that? I think plaintiffs are trying to recast that claim. But I think their claims as pled were claims. And as they've litigated in this case were those that could be exhausted and were the same as their 504 and ADA claims. We would ask that the court affirm the lower court's decision in favor of the district. Thank you, Ms. Schmanke. Mr. Pinn, your rebuttal. Mr. Pinn, are you familiar with the Nelson decision from this court this summer? The Nelson decision? Yes. Yes. Briefly, Judge Malloy, to your point, yes, there was, what you've raised, what's the practical difference here? And the practical difference is there was always a refusal. And I'd point, you know, there was an IEP drafted by the district. But it was at APP 126. Before that was even presented, again, a refusal was indicated. What's the difference? That's the same question my clients would have. Why not just a Section 504 plan? My clients asked for a Section 504 evaluation. And the answer to that was, you need an IEP. So they were rebuffed at every turn when they said, all we want is a 504. And so, again, this comes back to the statutory construct of parental rights. And that is paramount. Not what the school district's choosing and what the school district chooses to force. Your Honor, go ahead with your question. I know I'm out of time, but I want to. The constitutional claim. I just, I meant to ask this during your first part of your argument. I just want to know what you're asking for in the constitutional claim. Yeah, I mean, that is that substantive due process for parental choice. That's right. That, again, their right to control the medical and the educational decisions of the student here. Medical from the standpoint of therapy that the school district's saying he'd need to receive through them and their choice on education. And so we would agree that, yes, those are separate and are not redressable through the IDEA process. Judge, did you have a question? No? OK. Thank you, Your Honors. Thank you, Mr. Poon.